IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL A. GARDNER,        )
                                      )
        Petitioner,       )
                                      )
      v.                      )      1:18-cv-1547 (LMB/IDD)
                                      )
HAROLD W. CLARKE, Director, Virginia   )
    Department of Corrections,        )
                                      )
        Respondent.     )

## MEMORANDUM OPINION

Michael A. Gardner ("Gardner" or "petitioner") petitions the Court for a writ of habeas

corpus under 28 U.S.C. § 2254, arguing that his original trial counsel during his state-court

prosecution rendered constitutionally deficient performance and that state prosecutors failed to

comply with their obligations under Brady v. Maryland, 373 U.S. 83 (1963). Before the court is

Harold W. Clarke's ("Clarke" or "respondent") motion to dismiss the petition, which has been

fully briefed. For the reasons stated below, Clarke's motion will be granted, and Gardner's

§ 2254 petition will be dismissed.

I.

A.

In June 2011, Gardner was arrested and charged in the Circuit Court of Arlington County,

Virginia with four offenses: three counts of aggravated sexual battery of C.R., C.K., and M.G.,[1]

three young girls under the age of 13 who were friends of Gardner's daughter, in violation of Va.

---

[1] Consistent with the state court decisions and documents in the underlying record, all juvenile
complainants are identified only by their initials.

Code Ann. § 18.2-67.3;[2] and one count of object sexual penetration of M.G. in violation of Va.

Code Ann. § 18.2-67.2.[3] The criminal charges stemmed from allegations that Gardner had

inappropriately touched the girls during sleepovers held at the Gardners' home.[4] A jury found

Gardner guilty of all charges related to C.R. and M.G., but the trial court declared a mistrial as to

the charge of aggravated sexual battery of C.K. after the jury was unable to reach a unanimous

verdict. On appeal, the Supreme Court of Virginia vacated Gardner's three counts of conviction,

holding that the trial court had erred in excluding character evidence proffered by Gardner. See

Gardner v. Commonwealth, 758 S.E.2d 540, 546 (Va. 2014).

Before Gardner could be retried, his niece M.S. came forward with additional allegations

of sexually inappropriate conduct.[5] As a result, he was charged with two additional counts of

aggravated sexual battery, and two trials were scheduled: a first trial on the charges related to

---

[2] A person commits aggravated sexual battery if he "sexually abuses [a] complaining witness" who "is less than 13 years of age." Va. Code Ann. § 18.2-67.3(A).

[3] A person commits object sexual penetration if he "penetrates the labia majora or anus of a complaining witness" who "is less than 13 years of age." Va. Code Ann. § 18.2-67.2(A).

[4] The state alleged the following: On June 16, 2011, Gardner's daughter E.G. had her friend C.K. over for a sleepover, with C.K. sleeping on the floor in E.G.'s room. Gardner came into the room during the night to comfort his daughter, who was frightened of a thunderstorm. After E.G. appeared to have fallen asleep, Gardner slid his hands inside C.K.'s pajamas and repeatedly touched her breasts, buttocks, and vagina. The next night, E.G. had C.K. and several other friends over for a sleepover to celebrate E.G.'s tenth birthday. C.R. and M.G. were among the girls invited to the sleepover; each was under 10 years old. While the girls were sleeping in the basement, Gardner snuck downstairs and touched C.R. on the portion of her pajama bottoms covering her vagina. He then touched M.G. in the same area, first over her underwear and then inside her underwear, and inserted his finger into her vagina.

[5] In a discussion with a therapist in 2014, M.S. stated that in 2009, when she was 12 years old, she had been watching a movie with E.G. at the Gardners' home when Gardner came into the room to offer the girls a massage. M.S. claimed that Gardner put his hands down her pants, massing her buttocks and vagina. She also claimed that later that night, while M.S. was sleeping on the floor in E.G.'s bedroom, Gardner came into the room and slid his hands inside M.S.'s pajamas toward her vagina. After M.S. said "go away," Gardner left the room.

M.S., and a second on the remaining charges related to C.R. and M.G.[6] Gardner engaged

Christopher Leibig ("Leibig"), an experienced attorney, to represent him in both proceedings.

Gardner felt that Leibig's experience with DNA and forensic evidence would be particularly

useful in undermining the state's evidence.

Two serious evidentiary issues arose before the second round of trials. The first involved

Leibig, Gardner's trial counsel, and what the prosecution characterized as a murder-for-hire

scheme. In January 2015, while Gardner was in state custody awaiting his trial on the M.S.

charges and his retrial on the C.R. and M.G. charges, he received a letter from William Hawley

("Hawley"), an incarcerated individual with a habit of coming forward with incriminating

information about others in an effort to reduce his own terms of imprisonment. Hawley and

Gardner had met one another while incarcerated in Virginia. Hawley's letter hinted at a plot to

kill, or otherwise prevent from testifying, the minor complainant witnesses:

> I want you to know I haven't forgotten what we've discussed. The friend you asked
> me to contact to see if he could help with the "3 problems" you have pre-trial will
> be passing through VA on a FL to NY "run[.]" Get back to me right away because
> I don't [sic] his visiting you to interfere with Robin and the kids [sic] anticipated
> visit, especially when it's only twenty minutes per Robin."

See Gardner v. Booker, No. CL16-2444, slip op. at 6 (Va. Cir. Ct. Aug. 9, 2017) [Dkt. No. 1-5]

("State Habeas Op.").

---

[6] It appears the second trial was to involve only the allegations involving C.R. and M.G. and not those involving C.K. that had resulted in a mistrial. Gardner ultimately pleaded guilty to five offenses: four counts of aggravated sexual battery, two related to M.S. and one related to each of C.R. and M.G., and one count of object sexual penetration of M.G. Nonetheless, the plea agreement Gardner signed in September 2015 identifies C.K. as a victim, and the prosecution's proffer of facts—which Gardner accepted would have been established at the second trial— includes allegations of inappropriate conduct related to C.K. as well as the other complainants. In any event, this issue has no bearing on this Court's resolution of Gardner's § 2254 petition.

Although Gardner took no action after receiving the letter, state officials nonetheless found it troubling,[7] particularly because they believed that Hawley's reference to certain facts—including the reference to Robin, Gardner's wife—lent some credibility to the statements. They summoned Hawley for an interview during which Hawley explained that Gardner had asked him for help in harming not only the complainant witnesses but also Detective Sonya Richardson as well as state prosecutors Nicole Wittman and Alejandra Rueda. State officials later claimed that there were no notes or recordings of their meetings with Hawley and that they had promised him nothing in exchange for his testifying against Gardner other than that they would submit a letter detailing his cooperation, which he could include as part of a petition for sentence reconsideration in another state.

In early February 2015, an undercover police agent visited Gardner at the Arlington County Detention Center. The agent told Gardner, "I'm here on behalf of our friend, our mutual friend. He wanted me to come by and see you." State Habeas Op. 7. Gardner replied, "I don't know why he would do that." Id. The agent told Gardner he was "uncomfortable" because of the security cameras in the visiting room but had been told "to stop by . . . and check on [Gardner] to make sure [he] w[as] ok." Id. Gardner responded, "[T]his is silly, I don't want to meet with you, no offense." Id. When the agent asked Gardner, "[D]o you want me to say anything to [our mutual friend] or that's it?," Gardner responded, "[T]hat's it." Id. The agent left the room.

Gardner was concerned about the visit and told Leibig about it. The day after the visit, Leibig sent the following email to the Commonwealth's Attorney for Arlington County:

---

[7] It is unclear exactly how or when state officials learned of Hawley's letter to Gardner.

> Dear Theo, a matter came to my attention today that I think I need to tell your office about as soon as possible. Long story short, a man visited my client Michael Gardner at the jail Saturday and suggested to him that he was wanting to be paid to commit murder of some of the witnesses against Mr. Gardner. Mr. Gardner did not know the person, and terminated the visit. He wants the matter brought to the attention of authorities. The man presented a Virginia ID to get the visit. The sheriff's office has his info, and Deputy Auerbach interacted with him. Can explain more when we talk.

State Habeas Op. 7-8. Leibig later spoke with local law enforcement and provided additional details about Gardner's statements about the undercover agent's visit.

Before trial, the prosecution moved to subpoena Leibig as a witness against Gardner. Although the prosecution conceded that it could not introduce Gardner's statements during the interaction with the undercover agent against him at trial,[8] it argued that Leibig's email was not subject to the same exclusionary rule and corroborated Hawley's suggestion that he and Gardner had discussed a murder-for-hire plot. Leibig hired counsel to represent him and opposed the prosecution's motion. Ultimately, the trial court held that Leibig's statements could not be used in the prosecution's case in chief but reserved ruling on the question whether Leibig or Hawley could be called as rebuttal witnesses in the event Gardner chose to testify on his own behalf. In reaching that decision, the trial court rejected Gardner's argument that those statements should be excluded as a violation of the attorney-client duty of confidentiality, reasoning that "[i]t was at Mr. Gardner's behest that Mr. Leibig reached out" to the Commonwealth's Attorney. See Br. in Supp. of Rule 5 Answer & Mot. to Dismiss [Dkt. No. 8] ("Resp't's Br.") 9. After the trial court issued its decision, Leibig's attorney addressed the court:

> Your Honor, during the recess, I met with Gardner [and] determined that his desire is to not lose counsel of choice[. Nonetheless,] the ethical obligations of the defense

---

[8] The trial court ultimately ruled that the state's decision to send an undercover law enforcement officer into the detention center to elicit incriminating statements from Gardner violated his right to counsel under the Sixth Amendment.

team in this case create an irreconcilable conflict and the ethics require the defense team to withdraw, even though it's against Gardner's wishes. It is unfortunate that the potential availability of Mr. Hawley as a rebuttal witness has created this problem but it has. That said, I have advised the defense team that it is their obligation under the rules to withdraw from the case and they so do.

See Pet. for a Writ of Habeas Corpus [Dkt. No. 1] ("Pet.") ¶ 28. Leibig withdrew as Gardner's attorney, and Gardner hired two new attorneys: Joe Flood ("Flood") and Brad Haywood ("Haywood").

The second evidentiary issue to arise involved recorded telephone conversations between Gardner's wife Robin and her brother, M.S.'s father. Before trial, the prosecution moved to declare Robin an adverse witness, seeking to admit recordings of conversations in which Robin articulated her belief in the truth of M.S.'s allegations and suggested that Gardner had affirmed the truthfulness of at least certain aspects of those allegations. The trial court ruled that Robin could not invoke her Fifth Amendment privilege against self-incrimination to avoid offering testimony and observed that it might be appropriate for the prosecution to seek to introduce Robin's recorded telephone conversations with M.S.'s father as impeachment evidence. The trial court deferred ruling on specific questions related to the admissibility or presentation of those telephone recordings until trial.

Gardner went to trial on the two charges related to M.S. in September 2015. On the third day of trial, the prosecution called Robin as a witness and asked whether she had spoken to her brother about M.S.'s allegations. Robin acknowledged that she had talked with her brother to convince him not to pursue charges against Gardner but denied conveying any message about her own belief in Gardner's guilt or about Gardner's admission to any allegations. Based on her testimony, the prosecution moved to admit the telephone recordings of her conversations with M.S.'s brother, arguing that Robin had mischaracterized those conversations and thereby opened

herself up to impeachment. The trial court granted the prosecution's motion, reasoning that Robin had "testified duplicitously" and that allowing the tapes to be played for the jury would "go[] to her prior inconsistent statements" as well as to "her willingness to be forthright with the Court and the jury." See Resp't's Br. 24. The court recessed for the day before the tapes could be played to the jury.

Before trial could resume on the fourth day, Gardner and the prosecution reached a plea agreement. Under the terms of the agreement, Gardner would plead guilty to one count of object sexual penetration and four counts of aggravated sexual battery, resolving not only the charges related to M.S. but also those related to C.R. and M.G. In return, Gardner would be sentenced to a total term of imprisonment of 40 years, with 20 years suspended, among other penalties including registering as a sex offender.[9] The state also promised not to prosecute Gardner with respect to "events described in" three police reports or for the murder-for-hire plot. Plea of Guilty to Felonies [Dkt. No. 8-2] ("Plea Agreement") 3. Although not named as an express condition of the plea agreement, the state also promised not to prosecute Robin for perjury in connection with her testimony during the third day of trial. The plea agreement Gardner signed acknowledged that he was waiving his right to appeal; "all objections to the admissibility of evidence, the legality of [his] arrest, and any search and seizure of property"; and his constitutionally guaranteed trial rights. Id. 1-2.

The trial court conducted a lengthy plea colloquy before deciding whether to accept the plea agreement. Gardner, who has a law school degree and was a business executive before

---

[9] Under Virginia law, the prosecution and the defendant may reach a plea agreement that "[a]gree[s] that a specific sentence is the appropriate disposition of the case." Va. Sup. Ct. R. 3A:8(c)(1)(C). The trial court may accept or reject the agreement, and if the court rejects the recommended disposition, the defendant may withdraw his guilty plea. See id. r. 3A:8(c)(2)-(4).

being arrested, stated under oath that he understood the nature of the charges against him, had discussed any possible defenses with his attorneys, and had freely and voluntarily decided to plead guilty to all five charges. Gardner also agreed that he was knowingly waiving his trial rights along with the right to appeal "any issues that [he] may have raised during the trial." Tr. of Trial, Day 4 [Dkt. No. 11-3] ("Plea Colloquy") 17-18. When asked whether "any other promises [were] made to [Gardner] in exchange for [his] pleas of guilt," Gardner responded "[y]es," and his attorney offered the following explanation:

> MR. FLOOD: . . . As part of this case, [Gardner's] wife has testified, and she's been given immunity, and the government clarified that with an additional letter today that should be read in conjunction with [a previous] letter.
>
> It is not a condition of this plea but it was something that the Commonwealth did to bring this case to a conclusion.

Id. at 20-21. Gardner's attorney submitted the letter for the trial court's consideration and explained that it "amplifie[d] the degree and scope of the protection . . . provided to Ms. Gardner" to immunize her from any prosecution related to her testimony. Id. at 21-22. The court asked Gardner whether the grant of immunity to Robin "is a factor that [he] considered upon entering this plea," and he responded, "Very much so." Id. at 22-23. The court also asked Gardner whether he was "satisfied with the services of [his] attorneys in this case." Id. at 29. He responded, "Satisfied with the services of my current attorneys, yes." Id.[10] Based on these answers, the trial court found that Gardner had decided to plead guilty knowingly and

---

[10] Gardner made a similar clarification during his arraignment before the first day of trial. When asked whether he was satisfied with his counsel's performance, Gardner responded, "I don't know which counsel you are referring to, the trial counsel today or the counsel that left." Tr. of Trial, Day 1 [Dkt. No. 11-2] 17. The trial court acknowledged that "[t]here may be issues that occurred previously with other counsel" but asked whether Gardner was satisfied with the attorneys "who are prepared to go forward today" on his behalf. Id. Gardner responded, "Very much so." Id.

voluntarily, accepted the parties' plea agreement, found Gardner guilty of four counts of aggravated sexual battery and one count of object sexual penetration, and sentenced Gardner to the agreed sentence.

## B.

Gardner did not appeal his conviction or sentence. Instead, in September 2016, now represented by new counsel,[11] he filed a petition for a writ of habeas corpus in the Arlington County Circuit Court under Va. Code Ann. § 8.01-654. Gardner's petition argued that Leibig had rendered constitutionally deficient assistance in violation of the Sixth Amendment and that state prosecutors had failed to comply with their Brady obligations. The same judge who had presided over Gardner's trial and guilty plea was assigned to adjudicate his habeas petition.

Gardner pressed for factual discovery and an evidentiary hearing to develop his claims. He submitted two affidavits in support of this request. The first was a declaration signed by Leibig stating the following:

> Michael Gardner contacted me in the evening shortly after he had received a disturbing visit from someone. After some brief discussion, we agreed that I would visit Michael at the jail the next day. When we met the next day and discussed the visit from the man, I advised Gardner that I should quickly alert law enforcement of the visit, and Gardner agreed to this. I did not discuss with Gardner nor did I obtain his approval for the specific content of what I planned to say to Arlington law enforcement. . . . I hastily drafted an email on my iPhone to the elected Commonwealth's Attorney of Arlington. The language I used was mine, and was hastily typed, and not carefully chosen. When I typed in my message that the visitor "suggested to him [Gardner] that he was wanting to be paid to commit murder of some of the witnesses against Gardner", that was based on several leaps of logic that I myself made based on the contents of the letter Gardner had received and the strange visit. Gardner never stated to me that the visitor had actually stated that he wanted to be paid or that he offered to commit murder. But it was obvious to me based on my experience, the oddity of the stranger visiting Gardner and his use of ambiguous language, together with the letter from Mr. Hawley and other

---

[11] The same attorney who represented Gardner during his state habeas proceeding is also representing him for purposes of this § 2254 petition.

information, that I knew about the case that the visitor was referencing the same idea as Hawley's letter about the "three little problems." It was my mistake. I phrased the email incorrectly. I gave it little thought and wanted to type something that would be obvious enough and trigger the Commonwealth's [A]ttorney to call me so we could discuss the issue quickly. I never even considered the possibility that, given our motive in making the disclosure, the letter would be used as evidence against Gardner.

See Pet. ¶ 35 (first and second alterations in original). Gardner argued that Leibig's "hastily and inaccurately made statements" misled the trial court into "attribut[ing] both the statements and a guilty motive to his client" and that Leibig failed to correct that misapprehension in a timely fashion. See Pet. for Writ of Habeas Corpus [Dkt. No. 1-6] ("State Habeas Pet.") ¶ 51.

The second affidavit Gardner submitted was written and signed by his habeas counsel, Jonathan Sheldon ("Sheldon"), and described an August 2016 meeting between Hawley and Sheldon at the Augusta Correctional Center. According to Sheldon, Hawley told him that every meeting Hawley had had with local law enforcement had been recorded and that Hawley had been promised a financial reward for testifying against Gardner. Sheldon also averred that Hawley had refused to sign a sworn declaration attesting to those statements.

The warden of the correctional facility where Gardner was being incarcerated, who had been named as the respondent, moved to dismiss the habeas petition based on the record and the parties' written submissions. In July 2017, the state judge's law clerk called the respondent's counsel ex parte and asked him to prepare a dismissal order. Although Gardner objected to the court's entry of an order that had been drafted by the respondent—arguing, among other things, that the proposed order was "overtly biased and plain wrong in its factual findings and legal conclusions," see Gardner's Objs. to the Warden's Proposed Final Order [Dkt. No. 1-5] 32—the court adopted the 31-page proposed order as its own without making any changes.

The court's order rejected Gardner's call for de novo factfinding, ruling that both state and federal law allow a court to "decide the merits of a habeas petition on the basis of the record if the allegations can be fully determined on the basis of recorded matters." State Habeas Op. 14-15 (internal quotation marks omitted) (quoting Shaikh v. Johnson, 666 S.E.2d 325, 331 (Va. 2008)); see also id. at 15 ("[A] state habeas court need not hold an evidentiary hearing in every case to make reasonable fact determinations." (quoting Gray v. Zook, 806 F.3d 783, 792 (4th Cir. 2015))). With respect to Gardner's ineffective assistance claim, the court held that the issue had been fully litigated in several pretrial motions and that under Henry v. Warden, 576 S.E.2d 495 (Va. 2003), Gardner was barred from relitigating the issue in a state habeas proceeding. The court also held that Gardner had failed to make the necessary showings under both prongs of the Strickland v. Washington, 466 U.S. 668 (1984), test for ineffective assistance claims. Turning to Gardner's Brady claim, the court struck Sheldon's affidavit as inadmissible hearsay and ruled that without any other evidence of Hawley's statements, Gardner had "failed to demonstrate that any exculpatory evidence was withheld by the prosecution." State Habeas Op. 30. The court also held that Gardner's Brady claim was unsuccessful because he had failed to show a reasonable probability that the outcome of his criminal proceeding would have been different had prosecutors disclosed the allegedly exculpatory evidence. Accordingly, the court dismissed Gardner's petition.

Gardner appealed the order of dismissal to the Supreme Court of Virginia, which summarily affirmed, stating only that "the Court is of the opinion there is no reversible error in the judgment complained of." Order [Dkt. No. 1-4]. The state supreme court also summarily rejected Gardner's petition for rehearing. Order [Dkt. No. 1-3]. For purposes of federal habeas review, this Court "look[s] through" the state supreme court's unexplained decisions to the last

11

state court decision to "provide a relevant rationale" and "presume[s] that the unexplained decision[s] adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

II.

Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "imposes a limitation on [federal courts'] preexisting authority . . . to grant the writ of habeas corpus to state prisoners." D.B. ex rel. R.M.B. v. Cardall, 826 F.3d 721, 731 n.7 (4th Cir. 2016). Of the values underpinning § 2254, none is more vital than "a healthy respect for the state courts' ability to conduct just trials and to ferret out constitutional error, both at the trial and appellate levels." Cooper v. Taylor, 103 F.3d 366, 369 (4th Cir. 1996). In that vein, § 2254(b)(1)'s exhaustion requirement requires that state prisoners first present their claims to state courts, which serves "principles of comity and federalism." Gray v. Zook, 806 F.3d 783, 798 (4th Cir. 2015). For any claim that was "adjudicated on the merits" by a state court, AEDPA demands that federal courts apply a highly deferential standard of review: No writ of habeas corpus should be issued unless the state court's adjudication of that claim resulted in a decision that (i) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (ii) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The deference AEDPA demands of federal district courts "encompasses both the state court's legal conclusions and its factual findings," Lenz v. Washington, 444 F.3d 295, 299 (4th Cir. 2006), and the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold," Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

Gardner advances two arguments in his § 2254 petition: (i) that Liebig rendered constitutionally deficient performance that effectively deprived Gardner of the counsel of his choice and of his ability to testify on his own behalf at trial; and (ii) that state prosecutors violated their Brady obligations by failing to reveal evidence that could have been used to impeach Hawley's credibility. At the outset, Gardner argues that AEDPA's deferential standards of review do not apply because these claims were not "adjudicated on the merits" by the state court. In support, he points to Gordon v. Braxton, 780 F.3d 196 (4th Cir. 2015), which held that a claim "is not adjudicated on the merits when the state court makes its decision on a materially incomplete record"—as, for instance, "when [the] state court unreasonably refuses to permit further development of the facts of a claim," id. at 202 (internal quotation marks and citation omitted). Gardner also argues that in assessing his claims for purposes of respondent's motion to dismiss, this Court "must accept his allegations as true." Pet. ¶ 46 (citing Wolfe v. Johnson, 565 F.3d 140, 169 (4th Cir. 2009); Conaway v. Polk, 453 F.3d 567, 589 (4th Cir. 2006); and Walker v. True, 399 F.3d 315, 319-20 (4th Cir. 2005)).

Gardner's arguments are unconvincing. As respondent points out, AEDPA's requirement that habeas claims must have been "adjudicated on the merits" in state court does not mean that the state court must hold an evidentiary hearing in every case or on every claim. The Fourth Circuit has emphasized that a "state habeas court need not hold an evidentiary hearing in every case to make reasonable fact determinations." Gray, 806 F.3d at 792; see Strong v. Johnson, 495 F.3d 134, 139 (4th Cir. 2007) (recognizing that state habeas courts may reasonably determine disputed facts "based on competing affidavits" and "without a hearing"); see also Schriro, 550 U.S. at 474 (holding that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief," the habeas court "is not required to hold an evidentiary

hearing"). Gardner endeavors to divide his underlying criminal prosecution from the state habeas process, see, e.g., Gardner's Reply to the Director's Mot. to Dismiss [Dkt. No. 11] ("Gardner's Reply") 8 ("Neither the state habeas court nor the state trial court held evidentiary hearings."); id. ("[T]he trial court never heard what the state habeas court heard . . . ." (emphasis omitted)), suggesting that the state habeas court should have approached his claims de novo and was required to conduct discovery or an evidentiary hearing. Yet the fact remains that the same judge who oversaw Gardner's trial and took his guilty plea also adjudicated his state habeas petition. When the judge adjudicated his habeas petition—which was filed just one year after the trial proceedings and plea colloquy—she was able to rely on her "recollections of previous events," see Thomas v. United States, No. 2:11-cr-58, 2018 WL 3999709, at *2 (E.D. Va. Aug. 21, 2018), and her ability to "gauge[] the credibility" of the relevant witnesses, see Titcomb v. Wyant, 333 S.E.2d 82, 87 (Va. Ct. App. 1985).[12] That proximity to the relevant evidence provided a firm factual basis for the findings articulated in the order denying the state habeas petition—findings which, under AEDPA, are entitled to deference.

Likewise, the cases on which Gardner relies do not support his quest for de novo review, factual discovery, and an evidentiary hearing. Gordon, for instance, involved a habeas petitioner's claim that his trial counsel had violated the Sixth Amendment by failing to file a

---

[12] The state court also had the benefit of Leibig's affidavit submitted as part of Gardner's state habeas petition. Gardner objects that "[t]here is no mention anywhere in the state court opinion of Leibig's declaration, the new facts in the declaration, how they compare to what the state court knew at the time of trial or whether those facts were available to Gardner at the time of trial." Gardner's Reply 5. There is no requirement that a court cite every matter it considers in reaching a decision. And as elaborated below, that the state court's opinion dismissing Gardner's habeas petition did not cite Leibig's affidavit is unsurprising given the court's independent and dispositive conclusion that Gardner was not prejudiced by any deficient performance of counsel.

notice of appeal despite the petitioner's request that he do so. 780 F.3d at 199. The petitioner's

trial counsel submitted an affidavit contradicting the petitioner's account, and the trial court

dismissed the petition without holding an evidentiary hearing. Id. at 199-200. The Fourth

Circuit held that the petitioner's ineffective assistance of counsel claim had not been

"adjudicated on the merits" and therefore the federal district court should have applied de novo

review rather than § 2254(d)'s more deferential standards. Id. at 203-04. Gordon, in other

words, involved a pure credibility dispute for which the factual predicates had never been

developed before any state court other than in competing affidavits before the state habeas court.

That is not the case here. The state court held two pretrial hearings to discuss the issues related

to the alleged murder-for-hire plot and Leibig's email to the Commonwealth's Attorney.

Although those hearings were not, strictly speaking, "evidentiary" in that neither Leibig nor any

other witness was called to testify, they did involve extensive discussions about the relevant

evidence and gave the state court ample opportunity to evaluate the issues.

The state court also conducted a comprehensive plea colloquy in which she was able to

observe Gardner's demeanor as she asked him about the reasons underlying his decision to plead

guilty. Most important, even assuming Gardner is correct that Leibig's habeas affidavit

contradicted his statements (or lack thereof) before Gardner's trial, those differences were

immaterial to the state court's factual finding (again based on her recollections from the trial and

the evidence in the record) that Gardner's decision to plead guilty was not motivated by any

issues with Leibig. For these reasons, Gordon does not require this Court to review Gardner's

claims de novo. Likewise, although Wolfe and Walker stand for the proposition that a federal

court must assess a habeas claim de novo "where a state court has not considered a properly

preserved claim on its merits," Wolfe, 565 F.3d at 161 (quoting Monroe v. Angelone, 323 F.3d

15

286, 297 (4th Cir. 2003)); accord Walker, 399 F.3d at 319 ("Because the claim was not adjudicated on the merits, our review is de novo." (quoting Hudson v. Hunt, 235 F.3d 892, 895 (4th Cir. 2000))), there is no question that the state court, in dismissing Gardner's habeas petition, addressed both of his claims on the merits. And although Walker and Conaway state that dismissal of a federal habeas petition without discovery or an evidentiary hearing is evaluated "under the standards governing motions to dismiss made pursuant to Rule 12(b)(6)," Conaway, 453 F.3d at 582 (citing Walker, 399 F.3d at 319 n.1), that rule does not negate the deference AEDPA demands where the state court has adjudicated a claim on the merits, see Schriro, 550 U.S. at 474 (holding that "a federal court must take into account [AEDPA's deferential standards of review] in deciding whether an evidentiary hearing is appropriate").

Gardner has failed to demonstrate that his claims were not adjudicated on the merits for purposes of § 2254(d) or that he is entitled to discovery or an evidentiary hearing. Accordingly, respondent's motion to dismiss will be resolved based on the existing record and the parties' written submissions, and Gardner's two habeas claims will be assessed in light of the factual and legal deference AEDPA requires.

III.

A.

Gardner first argues that Leibig's incautious email to the Commonwealth's Attorney, as well as his subsequent failure to clarify the record with respect to whether the email constituted substantive evidence of Gardner's involvement in a murder-for-hire plot, violated his Sixth Amendment "right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). A habeas petitioner asserting an ineffective assistance of counsel claim must make two showings. First, he

must demonstrate "that counsel's performance was deficient," meaning that the alleged errors were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687. The constitutional adequacy of a counsel's performance depends on whether it "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices." Harrington v. Richter, 562 U.S. 86, 105 (2011) (quoting Strickland, 466 U.S. at 690). A federal habeas court's review of this question is "doubly deferential," in that it requires "a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." Cullen v. Pinholster, 563 U.S. 170, 190 (2011) (internal quotations marks and citations omitted). Second, the petitioner must also show prejudice—that is, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.[13] In the context of a guilty plea, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). That showing must be assessed "through an objective analysis" based on "the circumstances the defendant would have faced at the time of his decision" to plead guilty. Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988). The deficiency and prejudice prongs "are separate and distinct elements of an ineffective assistance claim," Spencer v. Murray,

---

[13] Gardner's petition also invokes the "right of a defendant who does not require appointed counsel to choose who will represent him," arguing that Leibig's errors "erroneously prevented [Gardner] from being represented by the lawyer he want[ed]" and that this erroneous deprivation "qualifies as structural error." See Pet. ¶ 42 (quoting United States v. Gonzalez-Lopez, 548 U.S. 140, 148 (2006)). But Gardner does not appear to be advancing an independent claim under Gonzalez-Lopez, and he concedes he must show prejudice to prevail on his first habeas claim. Rather, Gardner argues that Leibig's constitutionally deficient performance gave rise to a situation in which Gardner was effectively deprived of his counsel of choice and of his right to testify in his own defense—in other words, that Leibig's withdrawal and possible status as a prosecution witness were prejudicial consequences of his deficient performance.

18 F.3d 229, 232-33 (4th Cir. 1994), and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed," Strickland, 466 U.S. at 697.

In this case, the Court need not address whether Leibig's performance was constitutionally deficient, see Resp't's Br. ¶ 35; whether Gardner's guilty plea waived any right to challenge Leibig's pre-plea assistance, see id. ¶ 32; or whether Gardner's ineffective assistance claim is procedurally defaulted, see id. ¶¶ 13-14. The state court dismissed Gardner's state habeas petition in part because it found that he could not show prejudice stemming from Leibig's alleged errors. Because that determination was neither unreasonable in light of the record nor contrary to clearly established federal law, it is entitled to deference by this Court.

Although Gardner now attempts to link his decision to plead guilty with Leibig's allegedly deficient performance, he did not plead guilty after Leibig's email to the Commonwealth's Attorney first came to light, or after Leibig withdrew as Gardner's counsel, or after he had to hire new counsel, or even after the trial court reserved the question whether Leibig could be called as a rebuttal witness were Gardner to testify in his own defense. Instead, Gardner hired new counsel, pleaded not guilty, proceeded to trial on the charges related to M.S., and did not change his plea to not guilty until the fourth day of trial. His decision to plead guilty came only after his wife, Robin, testified about several conversations she had with her brother, M.S.'s father, that according to the prosecution indicated that Robin believed Gardner to be guilty and that Gardner had acknowledged the truthfulness of at least some aspects of M.S.'s allegations. The prosecution took the position that Robin had misrepresented the contents of those conversations, and the trial court agreed, stating that Robin had "testified duplicitously" and had failed to be "forthright" with the jury. See Resp't's Br. 24. Before the fourth day of

18

trial, the state agreed that it would not prosecute Gardner's wife for perjury in connection with this testimony. According to Flood, one of Gardner's trial attorneys whose assistance Gardner has not challenged as ineffective,[14] that agreement "amplifie[d] the degree and scope of the protection . . . provided to Ms. Gardner" and "was something that the Commonwealth did to bring [Gardner's] case to a conclusion." Plea Colloquy 21-22. When asked whether his wife's immunity from future prosecution was a factor in his decision to plead guilty, Gardner responded, "Very much so." Id. at 22-23.

Based on these facts, the state court found that Gardner's decision to plead guilty was driven "by a calculus related to the potential jeopardy his wife faced as a consequence of the trial testimony she offered" and that "the alleged failures of Leibig played no role" in that decision. State Habeas Op. 25-26. Because petitioner could not show a reasonable probability that he would have continued with trial but for Leibig's errors, the state court dismissed his ineffective assistance claim. Seen through AEDPA's deferential lens, this Court cannot say that the state court's decision was unreasonable or contrary to controlling precedent.

Gardner offers two arguments why the state court's finding was unreasonable. Neither is persuasive. First, he argues that the immunity letter mentioned during his plea colloquy was simply a confirmation of the state's existing agreement with Robin rather than "a quid-pro-quo for the plea." Gardner's Reply 6-7. That argument is flatly contradicted by Gardner's own statements, as well as those of his counsel, during the plea colloquy. Cf. Blackledge v. Allison,

---

[14] At the outset of trial, Gardner made clear that he was "[v]ery much" satisfied with the performance of Flood and Haywood, the attorneys he hired after Leibig withdrew. Tr. of Trial, Day 1 [Dkt. No. 11-2] 17. He reaffirmed his satisfaction three days later, when he entered his guilty pleas. Plea Colloquy 29. Gardner's voluntary and knowing statement that he was satisfied with the services of the replacement counsel he selected further undercuts his argument that Leibig's actions deprived him of the "counsel of his choice" in any meaningful way.

431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."). Second, Gardner argues that he only felt the sting of Leibig's alleged deficiency after the following chain of events fell into place: (i) the trial court ruled that the recorded conversations between Robin and M.S.'s father could be played for the jury; (ii) those conversations converted an incredibly weak prosecution case into an incredibly strong case; (iii) his "only chance of acquittal" given those conversations was to testify on his own behalf;[15] and (iv) testimony on his own behalf would trigger the accusation that he had plotted to kill the minor complainants, which would be too difficult to defend or would expose him "to the likelihood of an exorbitant sentence if convicted." Id. at 9. This argument is based on nothing but pure speculation, and it is thoroughly undercut by the fact that Gardner chose to plead guilty not only to those offenses involving M.S. (for which Robin's recorded conversations were relevant) but also to those involving C.R. and M.G. (for which Robin's statements would not have been nearly as relevant). The timing of Gardner's decision to plead guilty and the specific facts in the record belie the argument he has offered this Court and do not provide any basis to second-guess the state court's determinations.

The Court concludes that the state court's decision was well supported by the record and consistent with the line of cases governing ineffective assistance claims in the guilty plea context. Accordingly, Gardner's ineffective assistance of counsel claim is without merit.

---

[15] It is highly questionable how effective Gardner's testimony would have been given that although he testified in his first trial, the jury nonetheless found him guilty as to the counts involving C.R. and M.G.

## B.

Gardner next argues that the prosecution failed to disclose material exculpatory evidence that could have been used to impeach Hawley's credibility—namely, that state law enforcement officers had offered Hawley a financial reward for agreeing to testify against Gardner. Under Brady v. Maryland, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment," id. at 87. See also Giglio v. United States, 405 U.S. 150, 153-54 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [Brady's] general rule." (internal quotation marks and citation omitted)). "[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." United States v. Bagley, 473 U.S. 667, 674-75 (1985) (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)). Accordingly, there is no "real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281 (1999). In the guilty plea context, the relevant question for purposes of assessing materiality "is whether there is a reasonable probability that but for the failure to disclose the Brady material, the defendant would have refused to plead and would have gone to trial." See Sanchez v. United States, 50 F.3d 1448, 1454 (9th Cir. 1995).

The state court's rejection of Gardner's Brady claim rested on two independent grounds. First, the court struck Sheldon's affidavit as inadmissible hearsay and ruled that Gardner had failed to present any affirmative evidence of withheld Brady material. Second, the court held that Gardner could not show a reasonable probability that the allegedly withheld information would have produced a different result. Once again, the Court need not address Gardner's

21

arguments as to the first holding because the second is neither unreasonable nor contrary to established law.

The state court reasonably found that any allegedly withheld impeachment evidence relating to Hawley would not have affected Gardner's decision to plead guilty. Were the possible harm of Hawley's testimony as material as Gardner now claims, he would have pleaded guilty shortly after February 23, 2015, when the trial court ruled that Hawley might be called as a rebuttal witness. Instead, Gardner pleaded not guilty and proceeded to trial despite his awareness that Hawley could be called as a witness against him were Gardner to testify in his own defense. Further, as discussed above, Gardner "very much" chose to plead guilty in the wake of his wife's testimony to ensure she would be insulated from future prosecution for perjury. These two findings foreclose Gardner's argument that had it been properly disclosed, the impeachment evidence related to Hawley would have prompted Gardner to continue with the trial. Moreover, as Gardner's petition makes clear, Hawley was "a prolific and highly discredited career government informant," and Gardner's counsel was already in possession of a wealth of information that could have been used to discredit Hawley in the event that he testified. Pet. 7.[16] Gardner and his legal team were already well equipped to undercut any testimony Hawley might have given, and the suggestion that Gardner's assessment of the potential damage of Hawley's

---

[16] See also Pet. 7 n.5 ("In Gardner's August 12, 2015 motion to exclude Hawley's testimony, it was noted that Hawley's 'accusation represents just the latest in a truly astonishing string of confessions Hawley has obtained in murder cases . . . . Never before has Hawley come forward with such information while at liberty; he uses that time to run from the police, or assault them, or steal from the disabled and elderly—all facts well-documented in his background. Rather, his interest in fighting crime only emerges when he is incarcerated, accompanied by an explicit desire for favor from the government; anything to lessen his 15-year prison sentence or help the time pass more quickly. Never has Hawley come forward with the information at the time he received it, either, instead waiting months, years, even a decade or longer, eventually surfacing when litigation is pending, with one explanation or another for his delay.'").

testimony—let alone Gardner's ultimate decision to resolve all pending charges against him through a plea agreement—would have been materially different had he known the withheld information is simply incredible. Accordingly, the state court reasonably rejected Gardner's Brady claim, and that decision is not subject to disruption under § 2254(d).

IV.

For the reasons stated above, Clarke's motion will be granted, and Gardner's § 2254 petition will be dismissed, by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 18 day of July, 2019.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge